**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **Matthew S. Johnson**<br>**1511 Odell Ave**<br>**Rosedale, MD 21237** | * | |
| ***Plaintiff,*** | * | |
| | * | **Case No.:** |
| **v.** | * | **JURY TRIAL DEMANDED** |
| **Board of Regents of the University of Maryland,**<br>**on behalf of the University of Maryland,**<br>**Baltimore** | * | |
| ***Defendant.*** | * | |
| **Serve:** | * | |
| **University of Maryland Baltimore**<br>**Office of University Counsel**<br>**220 Arch Street, Room 03-111**<br>**Baltimore, MD 21201** | * | |
| **University of Maryland, Baltimore Police Dept.**<br>**Pine Street Station**<br>**214 North Pine Street**<br>**Baltimore, MD 21201** | * | |

---

## COMPLAINT

COMES NOW, Plaintiff, Matthew S. Johnson (hereinafter "Plaintiff"), by and through undersigned counsel, Dionna Maria Lewis, Esq., complains against Defendant, University of Maryland, Baltimore (hereinafter "Defendant" or "UMB") and in support thereof states as follows:

## INTRODUCTION

1. This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. (“Title VII”) the Civil Rights Act of 1866, Section 1981(a) (“Section 1981”), 42 U.S.C. § 1320d-6 *et seq*., the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. (“ADA”), the Rehabilitation Act, and the Maryland Fair Employment Practices Act Md. Code § 20-601 *et seq*. (FEPA) for the Defendant’s unlawful harassment, discrimination based on race (African American), disability, and retaliation (prior statutorily protected activity), against the Plaintiff, Matthew Johnson.

2. For nineteen years, Lieutenant (“Lt.”) Matthew Johnson has served the University of Maryland, Baltimore Police Department with distinction. A Marine Corps veteran, a Black police lieutenant, and the founder of the Department's nationally recognized Community Outreach and Support Team, he earned repeated Above Standards evaluations while managing a service-connected disability. Unfortunately, his working conditions deteriorated only after he complained of discrimination.

3. After Lt. Johnson sought assistance outside of Chief Thomas Leone's chain of command for the issues that he was experiencing in his work environment, based on information and belief, UMB and its responsible management officials removed duties and cut his command from seventeen (17) direct reports to two (2).

4. Additionally, based on information and belief, Defendant kept Lt. Johnson’s application for the Deputy Chief role from ever reaching the search committee, and turned his approved medical leave into a nine (9) month misconduct investigation. UMB concluded this 9-month-long investigation without issuing any discipline to Lt. Johnson and subsequently lowered his performance evaluation rating and stripped fifty-six hours of his annual leave from him.

5. Lt. Johnson brings claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act, for disability discrimination and retaliation under Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act, and for discrimination pursuant to the Fair Employment Practices Act ("FEPA").

**JURISDICTION AND VENUE**

6. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 and to 28 U.S.C. §§ 1391(b) as it asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., the Rehabilitation Act, the Americans with Disabilities Act, to redress and enjoin employment practices of the Defendant. The challenged employment practices occurred in Baltimore, Maryland, where Johnson worked and would have worked in the positions at issue.

7. This Court has federal question jurisdiction under 28 U.S.C. § 1331, and jurisdiction under 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 794a.

8. Venue is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

9. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendant transacts substantial business in this District, and Defendant maintains employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

10. On March 4, 2025, Johnson completed a Maryland Commission on Civil Rights ("MCCR") questionnaire alleging race discrimination, disability discrimination, and retaliation.

11. On July 22, 2025, Lt. Johnson filed EEOC Charge No. 531-2025-02457 with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race (African American), disability, and retaliation (prior statutorily protected activity).

12. The EEOC issued a notice of Right to Sue dated July 22, 2026, which Plaintiff or his counsel received on July 23, 2026. Accordingly, this action is filed within ninety (90) days of that receipt.

13. Plaintiff has exhausted all of his administrative remedies.

14. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

15. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

16. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of his constitutional and statutory rights.

17. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to Lt. Johnson.

## PARTIES

18. Plaintiff, Lieutenant ("Lt.") Matthew Johnson, is an African American male who resides in Baltimore County.

19. Defendant UMB is a constituent of the University of Maryland and an independent unit of State government.

20. On or about August 12,2007, Lt. Johnson began his employment with UMB as a University Police Officer I with UMB Police and Public Safety.

21. During the relevant period, Plaintiff was Defendant's employee within the meaning of Title VII, and thus entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

### A Distinguished Career: 2007–2022

22. After serving in the Marine Corps, Lt. Johnson joined UMB as a University Police Officer I on August 12, 2007. Over his career he held supervisory responsibilities in Operations, the Office of the Chief, and Support Services, and he conducted Internal Affairs investigations.

23. In 2019, Johnson founded COAST, the Community Outreach and Support Team, to strengthen relationships between the Department and the community it serves. That October of 2019, the International Association of Chiefs of Police honored him with its 40 Under 40 award.

24. UMB promoted Johnson to Police Lieutenant on June 22, 2020. The following month, Thomas Leone, who had risen from lieutenant to Acting Deputy Chief in 2018, became Chief.

25. Prior to joining UMB. Lt. Johnson had service-connected Post-Traumatic Stress Disorder (PTSD), for which the Department of Veterans Affairs assigned a fifty percent disability rating. When active, his symptoms, including recurrent panic attacks and disabling anxiety, substantially limit his ability to concentrate and the operation of his neurological and brain functions.

26. Notwithstanding his service-connected condition, Lt. Johnson performed his duties successfully. His qualifications included years of university policing, command responsibilities, program development, and internal investigations. His evaluations remained Above Standards through October 2024.

27. In 2022, Lt. Johnson, Lieutenant Tyrell Fleming, and other internal candidates applied for an Assistant Chief position, Requisition No. 2200004Q, which required six years as a certified University Police Officer.

28. Based on information and belief, UMB selected William Folden, a White external applicant who lacked that experience. Mr. Folden was separated in 2024 but that same year, UMB then hired a White lieutenant with no prior command experience, at a higher salary.

29. Based on Lt. Johnson's observation of the Department's command selections, he alleges that Chief Leone did not hire a Black officer in a command position before September 2026, although Lt. Johnson estimates that more than ninety percent of officers in the lower ranks are Black.

**Johnson Reports Discriminatory Treatment: 2023–May 2024**

30. Throughout 2023, based on information and belief, Lt. Johnson's unit was singled out. From March through August of 2023, COAST officers were repeatedly removed and reassigned without notice to him, sometimes by Operations sergeants who held lower rank. That same year, Assistant Chief Ellis directed a corporal to monitor Lt. Johnson's contact with Chancellor Perman. Then, on August 30, Johnson's Unit was the only unit inspected.

31. On August 3, 2023, Chief Leone told Lt. Johnson to put his concerns in writing and said he would take action. Accordingly, Lt. Johnson submitted a written complaint to Chief Leone and to Assistant Chief Bell, the next day. Interestingly, Chief Leone then directed Lt. Johnson to stop including Assistant Chief Bell on his complaints, and to bring his concerns only to him directly.

32. With his concerns unresolved, on or about September 19, 2023, Lt. Johnson went to Senior Vice President ("SVP") Dawn Rhodes and delivered a complaint packet dated September 19, 2023. The complaint expressly alleged a hostile work environment, discriminatory treatment, and continuous disparate treatment. ELR received the complaint package on September 28, 2023 and referred it to the Office of Accountability and Compliance ("OAC") as a discrimination complaint. At this point, Chief Leone was now aware that Lt. Johnson had complained about him and had gone outside his chain of command to do so.

33. On November 21, 2023, Johnson began weekly therapy with Anthony Carr, LCPC. Mr. Carr documented that most sessions addressed workplace stress and anxiety attributed to retaliation.

34. In early 2024, based on information and belief, Chief Leone told Lieutenant Fleming that Johnson's complaint was "messing with him and his family." When Leone was asked about the statement during the later OAC investigation, Leone said he did not specifically remember making it.

35. On May 3, 2024, ELR closed the investigation without telling Johnson its outcome. Its letter acknowledged that OAC had reviewed the matter because of his discrimination allegation and invited him to report retaliation. On May 29, 2024, Johnson received an Above Standards evaluation describing his performance as outstanding in all areas.

**UMB Reduces Johnson's Command: June–November 2024**

36. Within weeks of the investigation's closure, Chief Leone denied Johnson's proposal for a Police Athletic League ("PAL") basketball team, even though Assistant Chief Bell had approved it.

37. On June 13, 2024, Corporal Torbit, who had separately complained about Chief Leone, was removed from COAST upon his promotion to corporal and assigned to Officer-in-Charge (OIC) duty on the midnight shift.

38. In Lt. Johnson's nineteen years of service, no specialized-unit officer had been treated in this manner, and comparable requirements were not imposed on corporals in other specialized units.

39. The Orders issued in September 2024 detailed three more COAST corporals out of the unit effective October 20, 2024. Assistant Chief Bell approved Lt. Johnson's proposed staffing solution, but Chief Leone did not respond to it.

40. Despite the reduction of Lt. Johnson’s unit, he still received an Above Standards midyear evaluation on October 21–22, 2024, signed by Chief Leone.

41. In the November 7–8, 2024 reorganization, UMB terminated the assistant chiefs, removed the Police Communications Officers from Lt. Johnson's command, and placed him under Acting Major Duane Harrington. The civilian personnel who were removed from his command were then placed under Vanessa Harrington's supervision.

42. Between June and November 2024, Lt. Johnson's direct reports fell from seventeen to two, quickly reducing his supervisory responsibilities and his opportunity to demonstrate the leadership required for advancement.

**Lt. Johnson Turns to SVP Rhodes for Aid and Applies for Deputy Chief: December 2024**

43. On December 2, 2024, Lt. Johnson complained to SVP Rhodes that COAST officers had been removed from his unit and that he did not believe Chief Leone would give him a fair opportunity

to compete for the Deputy Chief role because of Leone's observed past practices and retaliation. SVP Rhodes was surprised that COAST was being dismantled because she had funded its expansion. She then told Lt. Johnson to speak with Chief Leone. It was only after Lt. Johnson's December 2, 2024 meeting with SVP Rhodes that three COAST officers were returned to his Unit.

44. Lt. Johnson met with Chief Leone on December 16, 2024. During that meeting, Leone had a printed agenda and he asked Lt. Johnson what SVP Rhodes had told Johnson. In his remarks, he referred to Lt. Johnson as having a "sense of entitlement." Chief Leone then accused Lt. Johnson of improperly taking leave on November 7, 2024, even though it was leave that Assistant Chief Bell had previously approved.

45. Later, on December 23, 2024, UMB approved Johnson's request for annual leave for his wedding in May 2025, which was almost five months away.

46. On December 25, 2024, Lt. Johnson applied for the Deputy Chief role with a recruiting firm, where he identified himself as Black, a protected veteran, and a person with a disability. The recruiting firm later acknowledged in writing that he was qualified for the position.

**Despite his Qualification, UMB Excludes Johnson from the Deputy Chief Search: January–March 2025**

47. On January 13, 2025, UMB and its responsible management officials assigned squad supervision to the other three lieutenants, but excluded assignments to Lt. Johnson.

48. At the February 18, 2025 command staff meeting, Millicent Holmes of Human Resources announced that Deputy Chief interviews would occur that week. Since Lt. Johnson had not been contacted about interviews, he asked Chief Leone about his application.

49. That evening, Chief Leone emailed Holmes and another official, copying Lt. Johnson, claiming he was sequestered from the process and did not know who had applied. Chief Leone later admitted to OAC that Lt. Johnson had told him in December 2024 that he had applied.

50. Five minutes after Chief Leone's email was sent, Vanessa Harrington, who did not appear as a recipient, replied and referred Lt. Johnson to Dan Rodas, a partner at the search firm Isaacson, Miller for more information.

51. On February 25, 2025, while Lt. Johnson was on approved Family and Medical Leave Act (“FMLA”) leave, Mr. Rodas told him the search committee had not selected him, despite calling him a strong applicant. It was later discovered in the OAC interview, that this statement was actually not true and that Lt. Johnson's application was never actually forwarded to the committee, which only considered sixteen resumes as a part of the process.

52. The later OAC record also showed that Chief Leone personally engaged the firm, supplied its leadership criteria, and directed a format that produced four unranked finalists. Vanessa Harrington chaired the committee.

53. Based on information and belief, according to what Millicent Holmes later told Lt. Johnson, Vanessa Harrington personally told the firm that Lt. Johnson was not qualified, which contradicted UMB's position that no UMB employee participated in the firm's review. Rodas, for his part, wrote on March 27, 2025 that Johnson was qualified but "less competitive."

54. UMB officials thus shaped Lt. Johnson's exclusion while attributing it to an independent search process. As a result, UMB's shifting accounts concealed who made the decision and why and Lt. Johnson never had the chance to compete before the committee for this role.

55. On March 3, 2025, Lt. Johnson submitted a whistleblower complaint to the USM Board of Regents and UMB Administration.

56. On March 4, 2025, he completed his Maryland Commission on Civil Rights ("MCCR") questionnaire alleging race discrimination, disability discrimination, and retaliation.

57. That same week, while Johnson was still on FMLA leave, UMB removed him as LInX Administrator without notice and instructed the civilian employee who took over not to consult him.

58. Then, later in March 2025, UMB also excluded Lt. Johnson from interviewing Deputy Chief candidates, while other lieutenants participated in the process.

59. On March 11, 2025, Johnson filed a formal discrimination complaint with OAC.

60. On March 17, 2025, OAC opened Case No. EP-4765, naming Chief Leone as a Respondent.

61. The next day, at a Command staff meeting, Chief Leone publicly criticized the Department's METERS contact information as outdated, a function Lt. Johnson had managed until November 2024. Ironically, Lt. Johnson had in fact submitted the update in January 2024, on a form bearing Chief Leone's own signature.

62. On March 19, 2025, Johnson reported continuing retaliation to OAC, and OAC interviewed him on March 24, 2025. After retaining counsel on March 26, 2025, Lt. Johnson asked on March 31, 2025 that further contact proceed through his attorney, citing safety concerns and fear of continuing retaliation.

63. On April 2, 2025, Major Duane Harrington told Lt. Johnson that PAL financial matters would have to go through him. Around the same time, Lt. Tyrell Fleming told Johnson that Maj. Harrington had declined an instruction to hold Lt. Johnson accountable over a PAL payment process, and Sergeant Kelli Blackwell reported being told not to have closed-door conversations with Lt. Johnson.

**Medical Leave and the Dismissal of Johnson's Complaint: April–May 2025**

64. The work environment and circumstances of his work conditions aggravated Lt. Johnson's anxiety and PTSD, which required medical leave.

65. UMB approved his FMLA leave from April 14 through May 23, 2025.

66. On April 29, 2025, HR representative Shardae Sangster issued written approval and instructions for coding paid leave during that period.

67. The same day, OAC circulated its draft report with comments due May 6, 2025, while Lt. Johnson was on approved medical leave. The investigator never interviewed Rhodes, Fleming, or Holmes. On May 9, 2025, two weeks before Lt. Johnson's leave ended, OAC dismissed EP-4765, describing Chief Leone's evidence as unrebutted.

68. On May 8, 2025, Lt. Johnson coded his April 20–May 3 timesheet as sick leave/FMLA, consistent with HR's instructions and Chief Leone approved it.

69. As also previously approved, Lt. Johnson's wedding took place during the approved medical leave period, from May 12 through May 21, 2025. UMB had approved annual leave for those dates five months earlier, and Johnson's therapist confirmed that participating in his wedding was consistent with his treatment goals.

**The Leave Investigation, the Lowered Evaluation, and the EEOC Charge: June–July 2025**

70. Lt. Johnson returned to work after Memorial Day in May 2025.

71. Three weeks later, on June 16, 2025, Lt. Johnson received an unexplained invitation to an HR meeting with no context offered.

72. On June 17, Sandra Jessee, ELR Manager, and Tanisha Burt, HR Director, informed Lt. Johnson that he was under investigation for FMLA abuse relating to his wedding.

73. Ms. Jessee had not examined the PlanIt record showing the wedding leave had been approved months earlier, but Lt. Johnson sent it to her as soon as he returned to his desk. In response Ms. Jessee asked what program the approval came from and despite Lt. Johnson having supporting documentation, UMB continued the investigation anyway.

74. As a part of this investigation, from June 27 through July 22, 2025, HR demanded Lt. Johnson's therapy dates, provider information, and documentation of individual treatment sessions.

75. Lt. Johnson (through counsel) supplied records from multiple providers, which Ms. Jessee still questioned. Millicent Holmes later told Lt. Johnson that the Department had never investigated anyone for such a thing, consistent with Johnson's own experience supervising employees and handling personnel matters.

76. On June 30, 2025, in the midst of that investigation, Major Harrington lowered Lt. Johnson's overall evaluation from Above Standards to Meets Standards. The evaluation stated that circumstances had limited Maj. Harrington's opportunity to evaluate Lt. Johnson, while praising Johnson's attendance and punctuality.

77. Lt. Johnson grieved the evaluation on July 11, 2025, and the grievance was denied at Steps I and II. The written Step II decision justified the rating by limited observation, citing both Harrington's own absence after a family loss and Johnson's leave, including leave taken after the rating period ended on March 31, 2025. Based on Plaintiff's understanding, Department Policy 1007.8.D prohibits counting protected FMLA leave against an employee in an evaluation.

78. While Maj. Harrington had previously told Lt. Johnson that his weekly COAST updates were no longer wanted, about a week after issuing the lowered evaluation, Harrington demanded a comprehensive COAST assessment within four days, which seemed like a set up to fail.

79. On July 22, 2025, Lt. Johnson filed his EEOC charge. UMB received notice of it and later submitted a position statement. The next day, Holmes told Johnson that Vanessa Harrington had personally contacted the recruiting firm during the Deputy Chief search.

80. The leave investigation remained open for nine months, leaving Johnson in continuing fear that his medically approved absence would be used to end his career.

**Contradictory Explanations and Closure Without Discipline: March 2026**

81. On March 17, 2026, Ms. Jessee closed the FMLA investigation without recommending or rendering any discipline. UMB acknowledged that the wedding dates had been approved as annual leave, but required Lt. Johnson to recode the disputed timesheets from sick leave to annual leave. On March 27, 2026, Johnson signed revised timesheets at HR's direction, stating in writing that his compliance was not agreement and that he regarded the process as retaliatory.

82. On March 31, 2026, UMB told the EEOC that Johnson had suffered no adverse action.

**A Second Search and the Loss of Annual Leave: April–September 2026**

83. On April 7, 2026, UMB posted two Major positions, Requisition Nos. 2600008N (Operations) and 2600008O (Protective Services), again using Isaacson, Miller and Rodas. The same day, Johnson reported Holmes's account that Vanessa Harrington had told the firm he was not qualified for Deputy Chief.

84. On April 24, 2026, Lt. Johnson submitted his EEOC rebuttal, challenging UMB's explanations and identifying the absence of Black command hires during Chief Leone's tenure. That same day, Fleming forwarded Johnson recruiting outreach for the Major search that Johnson had never received.

85. On May 22, 2026, Johnson discovered that UMB had transferred fifty-six hours from his sick-leave usage to his annual-leave usage. He asked Ms. Jessee to restore the annual leave, citing

HR's April 29, 2025 coding instructions, USM Policy VII-7.45, and Department Policy 1007.3, which permits an employee to convert illness during annual leave to sick leave.

86. In Lt. Johnson's nineteen years at UMB, medically necessary leave had always taken precedence when an employee became unable to work during previously scheduled annual leave.

87. This reclassification cost Lt. Johnson fifty-six hours of annual leave, which, unlike sick leave, carries cash value at separation.

88. By May 2026, Lt. Johnson’s annual-leave balance had fallen to approximately forty-seven hours and was projected to reach approximately sixteen hours by mid-June, forcing him to ask HR not to code him absent without leave. ELR reassigned the matter to Deneca Guile, Sr. ELR, who met with Lt. Johnson on June 24, 2026, but the issue remained unresolved as his balance dwindled.

89. Before July 2, 2026, within the posted window, Johnson applied for the Major position after learning that an external finalist lacked the posted degree. The position required a Bachelor's degree and seven years as a certified university police officer. Johnson met those requirements.

90. On July 6, 2026, Rodas interviewed Lt. Johnson and told him that finalists were already visiting campus. Johnson was never advanced.

91. Meanwhile, according to the resume UMB circulated to lieutenants, external finalist Jeffrey Featherstone had spent his career with the Baltimore Police Department, had no university-police service, and had no conferred Bachelor's degree.

92. UMB's willingness to advance an external candidate lacking the posted qualifications over a long-serving internal lieutenant with a pending EEOC charge, through the same firm and partner involved in the Deputy Chief exclusion, supports an inference of retaliation.

93. Ultimately, Barbara Duncan, a White woman, was selected for the Deputy Chief position.

94. Then, on or about September 4, 2026, Chief Leone selected Duane Harrington, who is Black, for the Major position Lt. Johnson sought, which would be Chief Leone's first hire of a Black command hire during his tenure.

95. Therefore, based on information and belief, UMB had advanced the supervisor who had issued Lt. Johnson's challenged evaluation while excluding Johnson because of his protected complaints.

**Medical Crisis and Continuing Harm: August 2026–Present**

96. By mid-2026, Lt. Johnson reported to his VA psychologist that the workplace was activating his PTSD and that he was experiencing panic attacks at work two to three times a week.

97. On August 13, 2026, Johnson suffered a panic attack at work and his physician, Dr. Nicole Ryder, excused him from work for medical leave.

98. On August 21, 2026, while Johnson was on medical leave, Ms. Guile issued a final decision refusing to restore the fifty-six hours. She relied on timesheet requirements and asserted that Johnson had not disputed specific dates and that his total leave was not reduced. She did not address HR's April 29, 2025 coding instructions, the policies Johnson cited, or Leone's approval of an identically coded timesheet from the same medical-leave period. Nor did she address Johnson's actual objection, which was the loss of annual leave and its distinct economic value.

99. Accordingly, the prolonged investigation has made Lt. Johnson afraid to request medical leave even when he needs it, compounding his anxiety and complicating his efforts to obtain treatment documentation.

100. While his disability predated these events, his symptoms worsened as the conduct escalated, from the onset of treatment in November 2023, through his April–May 2025 leave, to his August 13, 2026 crisis.

101. As a result of Defendant's conduct, Johnson has lost advancement opportunities, supervisory responsibilities, valuable annual leave, and professional standing, and has suffered emotional distress and aggravation of his preexisting condition. He seeks lost compensation and benefits, treatment expenses, and other losses to the extent caused by Defendant's unlawful conduct and recoverable under the applicable statute.

## **COUNT I: RACE DISCRIMINATION**
**Title VII, 42 U.S.C. § 2000e-2(a)**

102. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein. This count is pleaded in the alternative to Johnson's other motive theories, as Federal Rule of Civil Procedure 8(d) permits.

103. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

104. Md. State Government ("S.G.") Code Ann. § 20-606 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., prohibit discrimination against employees on the basis of race, as well as retaliation, as relevant here. See 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a)(1994)"). Due to the similarity between state and federal law, Maryland courts usually defer to the "federal criteria and seek guidance from Federal Title VII decisions in determining a

violation of the analogous State and county provisions." *Muse-Ariyoh v. Board of Education*, 235 Md. App. 221, 242 (2017).

105. Here, the four (4) elements of a *prima facie* case of race discrimination are met.

106. Lt. Johnson is Black, he applied for Deputy Chief on December 25, 2024, was qualified, and had a documented record of successful performance, including Above Standards evaluations through October 2024.

107. UMB denied Johnson an equal opportunity to compete for promotion by keeping his application from the search committee, notwithstanding the recruiting firm's acknowledgment that he was qualified. The exclusion denied him access to a higher-ranking position and its compensation, responsibilities, and professional opportunities.

108. The circumstances support an inference that race was a motivating factor, because qualified internal Black candidates had previously been passed over for a white external candidate who, on information and belief, lacked the posted experience. Additionally, Chief Leone made no hiring decisions for Black officers before September 2026, although the lower ranks were overwhelmingly Black; and UMB offered inconsistent accounts of who screened Lt. Johnson out and why.

109. UMB's asserted reliance on an independent search process does not explain its own officials' communications with the firm or its conflicting accounts of Lt. Johnson's qualifications and consideration.

110. As a result, Lt. Johnson lost advancement opportunities and the compensation and benefits of promotion, in amounts to be proven, and suffered other compensable harm.

111. Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

112. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

113. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

114. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race (Black/African American).

## COUNT II: RETALIATION
### Title VII, 42 U.S.C. § 2000e-3(a)

115. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein. This count is pleaded in the alternative to Johnson's other motive theories, as the Federal Rule of Civil Procedure permit.

116. Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

117. Here, Plaintiff was retaliated against after reporting discrimination. Lt. Johnson engaged in protected activity by opposing conduct he reasonably believed to be unlawful race discrimination, including through his 2023 and 2024 internal complaints to the extent they communicated such opposition, including his December 2,2024 meeting with SVP Rhodes; pursuing his March 2025 discrimination complaints; filing his July 22, 2025 EEOC charge; and participating in the charge process, including the April 24, 2026 rebuttal.

118. UMB knew of this protected activity through its supervisory officials, HR personnel, internal investigations, and its receipt and defense of the EEOC charge. Chief Leone, the subject of Johnson's complaints, expressed resentment of those complaints and of Lt. Johnson's resort to Rhodes.

119. After learning of that activity, UMB subjected Johnson to materially adverse actions, including exclusion from the Deputy Chief search, reduction of his responsibilities, the prolonged leave-abuse investigation, the evaluation downgrade, the annual leave reclassification and refusal to correct it, and exclusion from the 2026 Major finalists. Each act followed protected activity that preceded it.

120. Individually where materially adverse, and cumulatively as a continuing course of retaliation, these actions would dissuade a reasonable employee from reporting discrimination or participating in an EEOC proceeding. The escalating scrutiny, restrictions on Johnson's professional interactions, and public criticism are further evidence of that course.

121. Causation is shown by Chief Leone's expressed resentment; the sequence of complaints and adverse treatment; Lt. Johnson's strong evaluations before the downgrade; UMB's inconsistent hiring and evaluation explanations; the handling and duration of the leave investigation; and the reappearance of the same search participants after Johnson's EEOC charge.

122. But for Johnson's protected opposition and participation, UMB would not have taken these actions. Its stated reasons are pretexts for retaliation.

123. Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

124. Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

125. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

126. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages - including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs and is entitled to all available legal and equitable remedies.

127. Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and his injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

128. UMB must comply with Title VII, and by and through their conduct, violated the law.

129. The reasons proffered by Defendant for their unlawful conduct are pretextual and Defendant cannot offer any legitimate reason for their unlawful conduct.

130. Defendant is directly liable for the discriminatory acts or omissions of its employees while acting within the court and scope of their employment, under the theory of *Respondeat Superior*.

131. Defendant’s actions were intentional, reckless, and malicious.

132. As a direct and proximate cause of Defendants’ conduct alleged throughout this complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages—including but not limited to past and future loss of income, benefits, and career opportunities, and aggravation of Johnson's preexisting conditions, in amounts to be proven at trial.

## COUNT III: DISABILITY DISCRIMINATION
### Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 and 794a

133. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein. This count is pleaded in the alternative to Johnson's other motive theories, as Federal Rules of Civil Procedure permits.

134. Defendant operated UMB as a recipient of federal financial assistance.

135. Lt. Johnson is an otherwise qualified individual with a disability and a record of disability. Throughout the relevant hiring and evaluation periods, he could perform the essential functions of his position and the position he sought, with or without reasonable accommodation, including medically approved leave when necessary. His later deterioration does not describe his capacity during that earlier period.

136. Johnson disclosed his disability in his December 25, 2024 application. UMB's HR officials also received his medical documentation and approved leave for his serious health condition. By June 2025, the officials administering his leave and evaluation knew of his disability-related limitations and treatment.

137. Because of his disability, UMB subjected Lt. Johnson to discriminatory treatment in his employment benefits and evaluation, including exceptional scrutiny of his medically approved absence, reliance on that absence to justify his lowered evaluation, and the reclassification and continued withholding of fifty-six hours of annual leave contrary to UMB's own coding instructions.

138. Discriminatory intent is shown by UMB's written reliance on Johnson's absence, its later inconsistent explanations, the absence of any sustained violation, and the unprecedented handling reported by Holmes and observed by Johnson in his own supervisory experience. UMB

treated disability-related absence as a basis for adverse treatment rather than evaluating Lt. Johnson's actual performance and administering his benefits consistently.

139. For purposes of this alternative count, the challenged treatment occurred solely by reason of Johnson's disability, and UMB's stated explanations were pretextual. Johnson does not rely on veteran status alone to establish disability discrimination.

140. UMB's intentional discrimination caused Johnson economic injury, including loss of valuable leave benefits and other proven pecuniary losses. Johnson seeks equitable relief and economic remedies under Section 504. He does not seek emotional-distress or punitive damages under this count.

## <u>COUNT IV: DISABILITY RETALIATION</u>
**Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 and 794a**

141. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein. This count is pleaded in the alternative to Johnson's other motive theories, as the Federal Rules of Civil Procedure permits.

142. Lt. Johnson engaged in protected activity by complaining of disability discrimination in his March 4, 2025 MCCR questionnaire and related internal complaint, pursuing that complaint through counsel, filing his July 22, 2025 EEOC charge identifying disability discrimination, and continuing to contest the disability-related treatment described above.

143. UMB knew of this activity through its internal investigation, the medical and leave documentation Johnson supplied to HR, and its response to the EEOC charge. Johnson's reasonable opposition remained protected regardless of whether any underlying allegation was ultimately sustained.

144. UMB then subjected Lt. Johnson to materially adverse treatment, including the prolonged leave investigation, the evaluation downgrade, the loss and continued withholding of annual leave, and

exclusion from the 2026 Major position search. These actions would deter a reasonable employee from seeking protection against disability discrimination.

145. The sequence of events, UMB's inconsistent explanations, its knowledge of Johnson's complaints, and the recurrence of the same decision makers establish causation. Based on reason and belief, but for Johnson's protected disability-related complaints and participation, UMB would not have taken these actions.

146. The retaliation caused loss of valuable benefits, career opportunities, and other economic harm. Johnson seeks the economic and equitable remedies Section 504 authorizes, and does not seek emotional distress or punitive damages under this count.

**COUNT V: DISABILITY DISCRIMINATION**
**Americans with Disabilities Act of 1990, 42 U.S.C. 12101, *et. seq*.**

147. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein. This count is pleaded in the alternative to Johnson's other motive theories, as the Federal Rules of Civil Procedure permits.

148. The ADA prohibits discrimination based on disability. *See* 42 U.S.C. § 12101 *et seq*. The ADA requires that covered employers to provide reasonable accommodations to employees with disabilities. Here, the Defendant failed to provide reasonable accommodations to Plaintiff.

149. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his disability.

**COUNT VI: VIOLATION OF SECTION 1981**

150. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein. This count is pleaded in the alternative to Johnson's other motive theories, as the Federal Rules of Civil Procedure permits.

151. As an African American/Black person, Plaintiff is a member of a protected class.

152. Because of his race (African American/Black), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1981.

153. Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

154. Defendant knew that Plaintiff is an African American/Black prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of his race.

155. Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his race (African American/Black).

156. Defendant has limited, segregated, and classified Plaintiff in a way that deprived his of employment opportunities and otherwise adversely affected her status as an employee, because of his race (African American/Black).

157. Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably then Plaintiff in the terms and conditions of employment.

158. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

159. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

160. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race (African American/Black).

**COUNT VII: VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT (FEPA) MD. CODE §20-601, *et. seq*.**

161. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein. This count is pleaded in the alternative to Johnson's other motive theories, as the Federal Rules of Civil Procedure permits.

162. The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

163. Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions.

164. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

165. Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

166. Here, Plaintiff was subjected to harassment or offensive conduct that is based on race and disability.

167. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race (African American/Black) and disability

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Matthew Johnson, respectfully prays that this Honorable Court grant him the following relief:

a.) Enter a declaratory judgement finding that the foregoing actions of Defendant violated Title VII, the ADA/Rehabilitation Act, Section 1981, and FEPA;

b.) Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c.) Award back pay that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendants alleged herein;

d.) Damages in the amount of $750,000.00 (Seven Hundred and Fifty Thousand dollars and zero cents);

e.) Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

f.) Order such other relief as this Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: October 20, 2026

Respectfully submitted,

Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 19486
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Matthew S. Johnson*